Tony BERRY, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–9707–CR–411.

Supreme Court of Indiana.

Dec. 17, 1998.

M.E. Tuke, Indianapolis, for Appellant.

Jeffrey A. Modisett, Attorney General, Randi E. Froug, Deputy Attorney General, Indianapolis, for Appellee.

SHEPARD, Chief Justice.

A jury convicted appellant Tony Berry of murder, Ind.Code Ann. § 35–42–1–1 (West 1998),[1] and class A arson, Ind.Code Ann. § 35–43–1–1 (West 1998), in the death of Kenneth Davis. The trial court sentenced Berry to sixty years for murder and twenty-five years for arson. After entering judgment on both crimes, the trial court "merged" Berry's convictions. In this direct appeal, Berry claims:

1) That his statement to a police detective was involuntary;

2) That the sentence imposed was manifestly unreasonable;

3) That the court erred by entering judgment on both arson as a class A felony and murder;

4) There was insufficient evidence to support convictions for both murder and arson; and

5) That the court erred by refusing to modify the State's jury instruction on aiding and abetting.

For reasons that follow, we affirm.

### Facts

On the evening of August 9, 1995, Innett Smith met Kenneth Davis at his place of work and they went to her home. Around 2:30 a.m., Davis left Smith's house.

Earlier that evening, Berry, Damon McGinty, Carlton Holcomb, and Gregory Ellis went to a strip club. The group remained at the bar until 3 a.m., when they went together to McGinty's house. At about 3:30 a.m., Davis approached the group in front of Berry's house and expressed an interest in buying drugs. Although he had no drugs, McGinty exchanged a bag of substitute "dummy" drugs for a $30 book of food stamps. Davis then left with the substance.

Once he discovered that he had been tricked, Davis returned to Berry's house. Davis began to argue with McGinty, and Berry became involved in the quarrel. McGinty testified that he could tell Berry "was ready to fight." (R. at 260.) McGinty pushed Davis and took a swing at him. As the fight moved across the street, McGinty took another swing and knocked Davis to the ground. At that point, Davis was no longer moving and appeared to be unconscious.

As Davis lay on the ground defenseless, Berry and Ellis kicked and stomped on him. McGinty then hit Davis in the head with a metal chair. The men returned to the porch and told Holcomb that they had beaten Davis. McGinty then left and did not return until the morning.

According to Holcomb and Berry's taped confession, Berry expressed his desire to burn Davis in order to conceal the crime. Berry and Ellis dragged Davis into a plastic dumpster behind the house. The two men then set fire to Davis' pants legs and to the trash around him. Davis attempted to save himself by climbing out of the dumpster, but Ellis hit him with a stick and a brick, and Berry pushed Davis back. The men watched the dumpster burn to the ground. When they returned to the porch, Berry and Ellis admitted to Holcomb that they had set Davis on fire.

Berry told McGinty to take a look at the dumpster when McGinty returned the next day. McGinty recognized the shape of Davis'

---

1. According to Indiana's arson statute, Ind.Code § 35–43–1–1, arson qualifies as a class A felony if

"it results in either bodily injury or serious bodily injury to any person other than a defendant."

head on his badly burned body. Berry admitted to McGinty that he had killed Davis by burning him. Berry then made a similar admission to Holcomb, but threatened him so he would not tell the police.

The police found Davis' body in the dumpster. A forensic odontologist identified the body as Davis by comparing dental records. Because of the body's condition, a forensic pathologist could only determine that Davis had died from undetermined homicidal violence. The body showed no evidence of smoke inhalation in the lungs, which suggests that Davis was not alive when he was burned. The pathologist added, however, that there was an equal chance that Davis was alive when his body was burned. A police expert testified that the fire had been started intentionally.

Several months later, in December 1995, Berry was arrested and incarcerated in the Marion County Jail on charges unrelated to this case. Detective Leslie VanBuskirk questioned him with the intention of discovering information about the instant crime. VanBuskirk warned Berry that she would stop him if he began to speak about anything other than the instant case. The detective read Berry his *Miranda* rights once before she started interviewing him and a second time on the tape. Berry signed a waiver form verifying that he had agreed to waive his rights. He proceeded to offer his version of events surrounding Davis' death. At no point on the tape did VanBuskirk promise Berry immunity or any other incentive in exchange for his statement. Berry's statement was admitted at trial.

### I. Berry's Statement Was Admissible

Berry maintains that his statement to Detective Leslie VanBuskirk was involuntary. He claims that the detective had promised him immunity and that his right against self-incrimination had been violated.

The voluntariness of a confession is to be determined from a totality of the circumstances. *Johnson v. State*, 269 Ind. 370, 380 N.E.2d 1236 (Ind.1978). The State bears the burden of proving beyond a reasonable doubt that the defendant voluntarily and intelligently waived his rights, and that the defendant's confession was voluntarily given. *Owens v. State*, 427 N.E.2d 880 (Ind.1981). We review the record for evidence of inducement by way of violence, threats, promises, or other improper influence. *Id.* We do not re-weigh the evidence, but rather determine whether there is substantial evidence to support the trial court's findings. *Baker v. State*, 272 Ind. 554, 400 N.E.2d 137 (1980); *Sotelo v. State*, 264 Ind. 298, 342 N.E.2d 844 (1976).

In the case at bar, the trial court determined that Berry voluntarily and intelligently waived his right against self-incrimination when he provided a tape-recorded statement to Detective VanBuskirk. Berry acknowledged that the detective read him his rights twice. Moreover, Berry reassured the detective a number of times during the conversation that he understood everything she was saying to him. (Supp. R. at 34–35.)[2]

We find no evidence to support Berry's claims of an offer of immunity or any other improper promises. While under oath, Detective VanBuskirk testified that she did not promise immunity and never promised not to prosecute Berry for his crimes. Berry also answered in the affirmative when asked if he had given his statement free of force, threats, or promises. Finally, Berry never requested to speak with an attorney regarding the instant charges. At no point during the taking of his statement did Berry say that he wished to speak with one of his attorneys, though he did have representation for the unrelated offense.

**2.** After reading him his *Miranda* rights, Detective VanBurkirk asked Berry, "[D]o you understand everything that I've read to you there?" to which he replied, "Yes." (Supp. R. at 34.) VanBuskirk then explained the waiver of rights and asked, "[D]o you understand all the waiver of rights that I read to you?" to which Berry responded,

"Yes." (Supp. R. at 34–35.) The detective then referred to Berry's signature at the end of the waiver form and asked,

"Do you understand at this time this applies to the rights that I read to you a second time, but now we're tape recording this statement?" to which Berry replied, "Yes." (Supp. R. at 35.)

There is sufficient evidence to support the trial court's decision to admit Berry's confession.

## II. Enhanced Sentence Was Improper

Berry contends that the imposition of sentences of sixty years for murder and twenty-five years for arson was manifestly unreasonable. He argues the trial judge failed to articulate adequately the process by which he determined those sentences.

■ Sentencing is conducted within the "discretion of the trial court and will be reversed only upon a showing of manifest abuse of that discretion." *Sims v. State*, 585 N.E.2d 271, 272 (Ind.1992). When a court engages in a balancing process between aggravating and mitigating circumstances, it is obligated to include a statement of its reasons for selecting the sentence imposed. Ind.Code Ann. § 35–38–1–3 (West 1998); *Hammons v. State*, 493 N.E.2d 1250 (Ind. 1986). The court's statement must identify all significant aggravating and mitigating circumstances, include a specific reason why each circumstance is aggravating or mitigating, and weigh mitigating circumstances against the aggravating factors. *Boyd v. State*, 564 N.E.2d 519 (Ind.1991).

This Court has restrained by rule its authority to review any sentence permitted by statute. Ind. Const. art. VII, § 4; Ind.Appellate Rule 17(A)(1). We examine whether the sentence appears to be "manifestly unreasonable in light of the nature of the offense and the character of the offender." App.R. 17(B).

■ In Berry's case, the sentencing court cited two aggravating circumstances. First, it found the statutory aggravating factor that the "imposition of a reduced sentence would depreciate the seriousness of the offense." (R. at 665); Ind.Code Ann. § 35–38–1–7.1(b)(4) (West 1998). This aggravator, however, only supports a refusal to reduce the presumptive sentence. *Walton v. State*, 650 N.E.2d 1134 (Ind.1995). As the State concedes, a reduced sentence was not under consideration. (Appellee's Br. at 11.) This aggravating circumstance was thus unavailable to support the enhancement of both sentences.

■ The trial court mentioned one other aggravator. After articulating the need for a stiff sentence, the judge stated that "the Defendant is in need of rehabilitation which can best be received at the Department of Corrections." (R. at 665.) Justice Sullivan's response to a strikingly similar claim in *Mayberry v. State* was appropriate in that matter and should be applied here:

> [T]he trial court found the statutory aggravating circumstance that "defendant was in need of correctional and rehabilitative treatment that could best be provided in a penal facility." There was, of course, no question but that defendant would be incarcerated in a penal facility; the issue here is whether the defendant should be incarcerated for more than the presumptive term. Thus, for this aggravating circumstance to justify in part an enhanced sentence, it must be understood to mean that the defendant is in need of correctional and rehabilitative treatment that can best be provided by a period of incarceration in a penal facility in excess of the presumptive sentence term. The trial court gave no specific or individualized statement of the reason why this defendant was in need of correctional and rehabilitative treatment that could best be provided by a period of incarceration in a penal facility in excess of the presumptive sentence term. *Cf. Robey v. State*, 555 N.E.2d 145, 150–51 (Ind.1990) (discussing requirement of a specific and individualized statement of the reasons supporting an enhanced sentence).

670 N.E.2d 1262, 1270–71 (Ind.1996); *see also Newhart v. State*, 669 N.E.2d 953, 955 (Ind.1996).

Because the aggravating circumstances identified by the trial judge were insufficient to support an enhanced sentence, we remand with instructions to impose the presumptive fifty-five-year murder sentence and twenty-five years for arson, each to run concurrently.

## III. Convictions for Murder and Arson Not Double Jeopardy

Berry argues that the trial court erred by entering judgment on both arson as a class A

felony and murder. He claims that to support both convictions with a single killing violates principles of the Double Jeopardy Clause of the Fifth Amendment, which is applicable to the states under the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Specifically, Berry contends that if Davis' death was a result of the fire, the arson charge would be a lesser included offense to the murder; if the death was from some other cause, then there would not be sufficient evidence to support arson as a class A felony. For support, Berry relies on the proposition espoused in *Baker v. State* that courts can compare the factual bases of crimes for the purpose of making double jeopardy determinations. 569 N.E.2d 369, 372 (Ind.Ct.App.1991).

■ Contrary to Berry's claims, review of multiple punishments under the Double Jeopardy Clause of the Fifth Amendment of the Federal Constitution is limited to the relevant statutes. *Grinstead v. State,* 684 N.E.2d 482 (Ind.1997). The factual elements in the charging instrument and jury instructions are not part of this inquiry. *Id.*

■ The test for defining the "same offense" for Fifth Amendment purposes was outlined in *Blockburger v. United States:* "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not." 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

■ Our murder and arson statutes do not constitute the same offense under *Blockburger* because each provision requires proof of an additional fact which the other does not. Murder requires a knowing or intentional killing, while class A arson requires that a person intentionally or knowingly damage property. *Compare* Ind.Code Ann. § 35-42-1-1 (West 1998) *with* Ind.Code Ann. § 35-43-1-1 (West 1998). Berry's convictions do not violate his federal double jeopardy rights.

■ The trial court sentenced Berry to sixty years for murder and twenty-five years for arson. The judge added that the sentences would "merge." (R. at 663-64.) A more proper way to describe the trial court's final determination would have been to say that Berry would serve the terms "concurrently." Nonetheless, the court was within its discretion in determining that Berry would serve his sentences for two separate crimes at the same time.

## IV. The Evidence Was Sufficient

Berry claims that testimony given by witnesses from the neighborhood was not a credible basis on which to support his conviction for murder and arson. His argument in this sense is two-fold. First, he says the testimony offered by neighborhood witnesses is not believable; second, he contends that fatal inconsistencies among the witnesses render their testimony "dubious" and subject to appellate court review.

■ The standard for reviewing sufficiency of evidence claims was well described by Justice DeBruler in *Brooks v. State,* as follows:

> [T]his Court does not reweigh the evidence nor judge the credibility of the witnesses, but instead looks to the evidence most favorable to the verdict and to all the reasonable inferences to be drawn therefrom. If, from that viewpoint, there is evidence of probative value from which a reasonable trier of fact could infer guilt beyond a reasonable doubt, the conviction will be affirmed.

560 N.E.2d 49, 53 (Ind.1990).

■ Contrary to Berry's claims, the State produced evidence consistent with the proposition that Berry was a willing participant in Davis' beating and the events that led to his death. McGinty and Holcomb testified that Berry participated in Davis' beating. McGinty stated that he saw Berry "stomping" on Davis. (R. at 264.) Berry admitted that he helped Ellis set fire to Davis when he was still alive. Berry pushed Davis back into the dumpster after Davis had regained consciousness and attempted to save his own life. By any measure, the State introduced

sufficient evidence to convict Berry of each crime.

◼ As for Berry's second argument, application of the "incredible dubiosity rule" is limited to cases "where a sole witness presents inherently contradictory testimony which is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the appellant's guilt." *Tillman v. State*, 642 N.E.2d 221 (Ind.1994). Berry charges that the testimony of the State's witnesses contains inconsistencies among their statements, not that any one individual contradicted himself. Therefore, this rule is not applicable.

### V. Instructions on Aiding and Abetting Were Proper

At trial, Berry tendered an instruction on aiding and abetting. He now asserts error in the trial court's refusal of that instruction.

◼ Berry's trial counsel objected to the State's instruction on accomplices on the basis that it was "prejudicial to his case."[3] On appeal, Berry argues that the instruction was improper, that it was incomplete, and that it did not allow him to present an adequate defense. These arguments are forfeited by Berry's failure to make them at trial.

◼ Berry proposed his instruction # 9 as an alternative to the State's tendered instruction on aiding and abetting. It read: "In order to be guilty as an accessory, one must intend by his own actions to cause or facilitate the commission of the crime by the principal offenders." (R. at 70.)

The substance of Berry's tendered instruction was covered in final instruction # 9A. (R. at 103.) The pertinent portions of this instruction are as follows:

A person is responsible for the actions of another person when ... he knowingly aids, induces or causes the other person to commit a crime....

**3.** The instruction was number eleven, which read as follows:
An accomplice is one who testifies that he was involved in the commission of a crime with the defendant.
An accomplice is competent as a witness for the State or the defendant in the trial of a

To aid is to knowingly support, help, or assist in the commission of a crime.... In order to be held responsible for the actions of another, he need only have knowledge that he is helping in the commission of a crime.

*Id.* While instruction # 9A informs the jury that a defendant must "knowingly" participate, it also states accurately that a defendant is not required to participate in every element of a crime to be an accomplice. Thus, the court's instruction covered the topic of the instruction Berry tendered and did so more completely and more accurately. The court was correct to reject Berry's instruction under our case law governing such decisions. *Cf. Davis v. State*, 265 Ind. 476, 355 N.E.2d 836 (1976).

### Conclusion

For the reasons set forth above, we affirm the conviction.

DICKSON, SULLIVAN, SELBY and BOEHM, JJ., concur.

criminal case. The testimony of any accomplice is to be received and weighed by the Jury in the same manner and according to the same rules as the testimony of any other witnesses.
(R. at 83.)